# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

JANET L. MARION,

      Claimant,

(Terminated 3/9/2020)

MARY JANE MARION,

      Claimant,[1]

vs.

ANDREW M. SAUL,

Commissioner of Social Security,

      Defendant.

No. 19-CV-76-LRR

**REPORT AND RECOMMENDATION**

_____

      Plaintiff Mary Jane Marion ("Claimant's mother") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her daughter Janet L. Marion's ("Claimant") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34.  Ms. Marion contends that the Administrative Law Judge ("ALJ") erred in determining Claimant  was not disabled.  For the reasons that follow, I recommend that the District Court **affirm in part and reverse and remand in part** the Commissioner's decision.

_____

[1] Claimant Janet L. Marion died on December 8, 2019.  (Doc. 17 at 1.)  Her mother, Mary Jane Marion is substituted as Claimant in this matter.  (*Id.*)  Notwithstanding this substitution, all references to "Claimant" in this Report and Recommendation are to Janet L. Marion.

Case 1:19-cv-00076-LRR-MAR    Document 22    Filed 04/21/20    Page 1 of 55

# I.    BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 13) and only summarize the pertinent facts here.  This is an appeal from a denial of disability insurance benefits ("DIB").  Claimant was born on September 7, 1964.  (AR[2] at 175.) Claimant had a bachelor's degree in accounting.  (*Id.* at 202.)  She allegedly became disabled due to neuropathy in her feet and possibly in her hands.  (*Id.* at 201.)  Claimant's alleged onset of disability date was September 15, 2015.  (*Id.* at 175.)  Claimant filed an application for DIB on June 28, 2016.  (*Id.* at 10.)  Claimant's claim was denied originally and on reconsideration.  (*Id.* at 84-87, 91-95.)  A video hearing was held on July 23, 2018 with Claimant and her attorney Corbett Luedeman in Coralville, Iowa and ALJ Joan H. Deans in Kansas City, Missouri.  (*Id.* at 10, 25-48.)  Vocational expert ("VE") Bob Zadow appeared by phone.  (*Id.* at 26.)  Claimant and the VE testified.  (*Id.* at 26-48.) The ALJ issued an unfavorable decision on September 18, 2018.  (*Id.* at 10-17.)

Claimant requested review, which the Appeals Council denied on May 6, 2019. (*Id.* at 1-5.)  Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1481 (2019).

On July 12, 2019, Claimant timely filed her complaint in this Court.  (Doc. 4.) On March 16, 2020, all briefing was completed, and the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

---

[2] "AR" cites refer to pages in the Administrative Record.

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not

severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

4

20 C.F.R. § 416.960(b)(1).  If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.  *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience.  *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2).  The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy.  *Eichelberger*, 390 F.3d at 591 (citation omitted).

A.    *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of September 15, 2015.  (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments:  non-insulin dependent diabetes mellitus, neuropathy, status post thalamus stroke, obesity, and cervical degenerative disc disease.  (*Id.*)  In addition, the ALJ found Claimant had the following nonsevere impairments: essential hypertension, benign thyroid nodule, hyperlipidemia, pulmonary nodule, stable adrenal adenoma, bilateral sclerotic cataracts, vitamin D deficiency, sleep disturbance, gastroesophageal reflux disease, chronic obstructive pulmonary disease, impaired L V relaxation, and anxiety.  (*Id.* at 13.)

 At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.  (*Id.*)  The ALJ specifically considered listings 1.04 (disorders of the spine), 9.00 (endocrine disorders), 11.04 (vascular insult to the brain), and 11.14 (peripheral neuropathy).  (*Id.*)  The ALJ also stated that Claimant's "representative

did not contend that the claimant's impairments [met] or medically [equaled] a listing. The claimant has the burden of proof at this step and has not met it." (*Id.*)

> At step four, the ALJ found that Claimant had the following RFC:

> [C]laimant [had] the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), including the ability to lift and carry up to 10 pounds, stand and/or walk up to 2 hours in an 8 hour workday, and sit at least 6 hours in an 8 hour workday. The claimant [could] never climb ladders, ropes and scaffolds, but [could] occasionally climb ramps and stairs, stoop, kneel, crouch and crawl.

(*Id.*) The ALJ further found Claimant was able to perform her past relevant work as an accountant and accounts payable clerk. (*Id.* at 16.)

The ALJ did not continue the analysis to step five, instead concluding that Claimant was not disabled beginning September 15, 2015 through September 18, 2018, the date of the decision. (*Id.* at 17.)

## B.   *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that

the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

### III.   DISCUSSION

Claimant's Counsel[3] alleges the ALJ committed reversible error by (A) failing to provide good reasons for the weight afforded to Claimant's treating psychologist's opinion, (B) failing to provide good reasons for finding Claimant did not credibly report her limitations and by failing to address Claimant's mother's non-medical source evidence, and (C) finding Claimant's mental impairments nonsevere at step two of the sequential analysis. Counsel further argues the ALJ was not appointed in a constitutional manner. Thus, Counsel argues that the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

---

[3] It is my normal practice to attribute arguments to parties. However, given the unique situation of this case, I am attributing arguments made on Claimant's behalf to "Claimant's Counsel" or "Counsel."

***A.***     ***The ALJ provided good reasons for the weight afforded to Claimant's Treating Psychologist's Opinions.***[4]

Luke Hansen, Psy.D., was Claimant's treating psychologist. Claimant began seeing Dr. Hansen in March 2017[5] and he completed a checkbox/short answer opinion form on May 10, 2017. (AR 567-74.) At that time, Dr. Hansen had seen Claimant three times. (*Id.* at 679-87.) In his opinion, Dr. Hansen stated Claimant had major depressive disorder, recurrent, moderate to severe. (*Id.* at 567.) Dr. Hansen noted that Claimant slept either excessively or very poorly and he was concerned that one of her medications contributed to her "drowsiness, fatigue, and periods of hypersomnia." (*Id.* at 567-68.) He opined, in part, that Claimant had no useful function in performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 570.) In other mental abilities related to work, he found Claimant was unable to meet competitive standards in the following areas:

- Remembering work-like procedures;
- Understanding and remembering detailed instructions;
- Carrying out detailed instructions;
- Maintaining attention for a two-hour segment;
- Maintaining regular attendance and being punctual within customary, usually strict tolerances;
- Sustaining an ordinary routine without special supervision;
- Interacting appropriately with the general public; and
- Completing a normal workday and workweek without interruptions from psychologically-based symptoms.

---

[4] I am addressing the parties' arguments in a different order than they were presented because I find this order legally expedient. Claimant's Counsel proffered arguments that apply to more than one issue; therefore, some arguments will be duplicated. In certain instances, it was difficult to discern which arguments applied to a particular issue because the parties referred to their "prior arguments" or "preceding arguments."

[5] Dr. Hansen states in his opinion that he began treating Claimant in February 2017, but his initial assessment of Claimant is dated March 28, 2017. (AR 679.)

He also found Claimant seriously limited in the following abilities:

- Understanding and remembering very short and simple instructions;
- Carrying out short and simple instructions;
- Setting realistic goals or making plans independently of others;
- Maintaining socially-appropriate behavior;
- Adhering to basic standards of neatness and cleanliness;
- Working in coordination with or proximity to others without being unduly distracted;
- Making simple work-related decisions;
- Asking simple questions or requesting assistance;
- Accepting instructions and responding appropriately to criticism from supervisors.
- Getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- Responding appropriately to changes in a routine work setting;
- Dealing with normal work stress; and
- Being aware of normal hazards and taking appropriate precautions.

(*Id*. at 570-71 (bullets added; tenses changed).)

Dr. Hansen stated that Claimant's mental impairments manifested in the following signs or symptoms: anhedonia;[6] appetite disturbance with weight change; feelings of guilt or worthlessness; mood disturbance; recurrent and intrusive recollections of a traumatic experience, which is the source of marked distress (losing her house); psychomotor agitation (legs constantly moving); persistent disturbances of mood or affect; emotional withdrawal or isolation; motor tension; emotional lability; easy distractibility; and sleep disturbance. (*Id*. at 569.)

Dr. Hansen explained that Claimant demonstrated "significant dysphoria, difficulties concentrating, difficulties in interpersonal relationships, all of which are

---

[6] Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/anhedonia.

9

amplified tremendously by chronic pain." (*Id*. at 571.) He further opined that Claimant's psychiatric conditions exacerbated Claimant's experience of pain or other physical symptoms, "although [Claimant felt] that physical activity and weather are the primary pain amplifiers." (*Id*.) Dr. Hansen also stated that Claimant's mental impairments caused her marked limitations in activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; and that "even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." (*Id*. at 572.) He opined that Claimant would likely miss more than four days of work a month and that her prognosis was poor. (*Id*. at 568, 573.) On June 19, 2018, Dr. Hansen, checked a blank on a form stating that the 2017 opinion continued to accurately reflect Claimant's limitations due to her impairments. (*Id*. at 951.)

The ALJ gave the opinion little weight because Dr. Hansen only treated Claimant three months before writing his opinion. (*Id*. at 16.) The ALJ also gave the following reasons for assigning only little weight to the opinion:

> [H]e imposed extreme limitations for the claimant, which are not supported by his own contemporaneous treatment notes . . . . or the observations of other treatment providers. The claimant's mental status examinations have been typically normal and her expressed concerns deal with familial stressors primarily. In addition, the opinions of the claimant's treating psychologist are not supported by the opinions of the State agency psychologists and consultative psychologist, which are given great weight.

(*Id*.)

### 1. *Legal Standard for Evaluating Dr. Hansen's Opinion*

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (noting internal citations omitted)). As a licensed clinical psychologist, Dr. Hansen is "an acceptable medical source" under SSA regulations. 20 C.F.R. § 404.1502(a)(2). His opinion is

therefore evaluated using the familiar factors enumerated in 20 C.F.R. § 404.1527: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. § 404.1527(c)(2).[7]

### 2. Analysis

#### a. Length and Frequency of Treatment Relationship

"When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the medical source's opinion more weight than . . . if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). As discussed above, Dr. Hansen only treated Claimant for two months, not the three months he claimed to treat her, prior to writing his original opinion. In the 13 months between the original opinion and his affirmation of his opinion, Dr. Hansen continued to see Claimant. This factor weighs slightly in favor of giving the opinion more than little weight.

#### b. Nature and Extent of Treatment Relationship

"Generally, the more knowledge a treating source has about [a claimant's] impairment(s), the more weight [the ALJ] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). In all, twelve appointments are documented in the record over a fifteen-month period. This factor weighs in favor of giving the opinion more than little weight.

#### c. Supportability

"The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). "A

---

[7] These rules apply to claims filed prior to March 27, 2017. 20 C.F.R. § 404.1527. Claimant's claim was filed June 28, 2016. (AR at 10.)

treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker*, 459 F.3d at 937. In addition, "'[t]he checklist format, generality, and incompleteness of the assessments limit [an] assessment's evidentiary value.'" *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (internal brackets omitted)); *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); *see also Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) ("[Dr. Hollis's] assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value. On that basis alone, the ALJ did not err in giving Dr. Hollis's RFC assessments little weight and relying more heavily on other opinions in the record.") (internal quotations and citations omitted). Therefore, a treating source's opinion can be given limited weight if it contains only conclusory statements or inconsistent opinions "that undermine the credibility of such opinions." *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quotation omitted).

Claimant's Counsel argues that the ALJ actually assigned no weight to Dr. Hansen's opinions because the ALJ found Claimant's mental impairments nonsevere. (Doc. 14 at 10.) Counsel asserts that the ALJ erred in concluding that the limitations Dr. Hansen assigned were "extreme" because Dr. Hansen found Claimant had "no useful ability to function" in only one category: "perform[ing] at a consistent pace without an unreasonable number and length of rest periods," which was not a good reason to reject Dr. Hansen's opinion. (*Id.* at 11.) Counsel also takes issue with the ALJ's conclusions that her "mental status examinations have been typically normal and her expressed

12

concerns deal with familial stressors primarily." (*Id.*) Claimant's Counsel argues that the ALJ ignored that Dr. Hansen "noted depressed mood and marginal insight in every one of his treatment notes, and consistently noted pain and sleep issues throughout his notes." (*Id.*) Counsel points out that Claimant cried at six different doctors' appointments. (*Id.* at 6-7 (citing AR at 301, 304, 344, 348, 602, 888-89).)

The Commissioner responds that Claimant reported only mild to moderate depression, had "ok" energy, and denied feeling worthless or hopeless. (Doc. 15 at 13 (citing AR at 682, 688, 691, 694, 697, 700, 711, 714).) The Commissioner also argues that although Claimant cried during some examinations, this was due to "the situation involving her physical impairments, not from a severe mental impairment." (*Id.* at 9 (citing AR at 301, 304, 344, 348, 602, 888-89).) The Commissioner notes that during those times when Claimant cried during appointments, her mental status examinations were normal. (*Id.*)

Claimant was referred to Dr. Hansen for behavioral management therapy to help her manage pain without medication. (AR at 679.) Claimant had recently been hospitalized and taken off her narcotic pain medications. (*Id.*) She was then-currently taking Aleve, a muscle relaxer, Gabapentin, and Cymbalta. (*Id.*) Claimant had quit her job because she was either in too much pain or because she fell asleep at work. (*Id.* at 680.) She was feeling frustrated and worthless due to limitations resulting from a stroke and ongoing pain. (*Id.* at 679.) Claimant lived with her mother, sister, and teenaged great niece who had behavioral problems.[8] (*Id.*) Claimant reported sleep difficulties, once going three days without sleep and then sleeping for up to 26 hours. (*Id.*) She also reported that although she got some relief from Aleve, as it wore off, she experienced

---

[8] In treatment notes, Claimant's great niece is usually referred to as Claimant's "niece." For consistency, she is referred to as Claimant's niece for the remainder of this Report and Recommendation.

more neuropathic pain in her feet and hands. (*Id.*) Claimant reported that she made friends and kept friends well and enjoyed watching television. She used to enjoy bowling, but no longer bowled because of pain. (*Id.* at 680.)

Dr. Hansen found Claimant's mood moderately depressed, her affect congruent,[9] and her thought content appropriate for the situation. (*Id.* at 680.) Claimant was oriented times three, had marginal memory, concentration, judgment, and insight into problems. (*Id.*)

On April 10, 2017, Claimant reported sporadic sleep, continued pain, mild dysphoria,[10] mild to moderate depression, and irritability. (*Id.* at 682.) She denied feeling worthless or hopeless and denied anhedonia. (*Id.*) Dr. Hansen found her judgment adequate; insight marginal; memory, speech, concentration, and eye contact and rapport okay; affect congruent; and mild to moderate depression. (*Id.* at 682-83.) Dr. Hansen introduced Claimant to sleep hygiene considerations and they discussed the link between poor sleep and pain. (*Id.* at 683.) He diagnosed her with adjustment disorder with depressed mood. (*Id.*) On May 10, 2017, Claimant's only complaint was "significant sleep variability." (*Id.* at 685.) She reported mild to depressed mood and denied feeling worthless or hopeless and denied anhedonia. (*Id.* at 685-86.) Dr. Hansen found her judgment adequate; insight marginal; memory, speech, concentration, eye contact, and rapport okay; affect congruent; and mild to moderate depression. (*Id.* at 686.) Claimant and Dr. Hansen discussed sleep hygiene techniques. (*Id.* at 687.) Dr. Hansen diagnosed Claimant with major depressive disorder, recurrent, moderate. (*Id.* at 686.)

---

[9] Congruent affect means "a person's emotions are appropriate for the situation." Biology Dictionary, *Euthymic*, *Mental Status Examination*, https://biologydictionary.net/weekly-news-digest-march-3-2020/.

[10] Dysphoria is "a state of feeling very unhappy, uneasy, or dissatisfied." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dysphoria.

These notes document the only appointments Dr. Hansen had with Claimant prior to writing his opinion. First, Dr. Hansen always found Claimant's depression mild to moderate, which means there is no support for his opinion that her depression was moderate to severe. Second, there is nothing in these notes that supports Dr. Hansen's conclusions that Claimant would be unable to meet competitive standards in the following areas:

- Remembering work-like procedures;
- Understanding and remembering detailed instructions;
- Carrying out detailed instructions;
- Maintaining attention for a two-hour segment;
- Maintaining regular attendance and being punctual within customary, usually strict tolerances;
- Sustaining an ordinary routine without special supervision;
- Interacting appropriately with the general public; and
- Completing a normal workday and workweek without interruptions from psychologically-based symptoms.

Dr. Hansen always noted that Claimant had an "okay" memory, which renders his opinions that Claimant would have trouble with instructions, procedures, or attention unsupported. There is nothing in Claimant's statements to Dr. Hansen that support these limitations. In addition, Dr. Hansen noted that Claimant made and kept friends and used to enjoy bowling, which makes his statement that she would have problems interacting with the public surprising. Finally, although Claimant stated that she quit her last job due to pain or sleepiness, those are generally physical symptoms, not psychological symptoms. The only thing Dr. Hansen had discussed with Claimant prior to writing his opinion was sleep hygiene techniques. Claimant was referred to Dr. Hansen for non-pharmaceutical management of her pain. There is no notation that Dr. Hansen felt Claimant's sleep issues were psychologically-based. Dr. Hansen, himself, was concerned that one of Claimant's medications was making her drowsy and fatigued. (*Id.* at 568.) Moreover, Dr. Hansen did not diagnose any mental impairment that justifies a

15

conclusion that Claimant had no useful function in performing at a consistent pace without an unreasonable number and length of rest periods. The mild to moderate depression that Dr. Hansen was treating with sleep hygiene instruction, some cognitive behavioral therapy[11] (*Id.* at 705), and instruction on strategies to handle situational stressors did not rise to the level of such a debilitating impairment.

Third, nothing in these treatment notes supports Dr. Hansen's conclusions that Claimant was seriously limited in the following abilities:

- Understanding and remembering very short and simple instructions;
- Carrying out short and simple instructions;
- Setting realistic goals or making plans independently of others;
- Maintaining socially-appropriate behavior;
- Adhering to basic standards of neatness and cleanliness;
- Working in coordination with or proximity to others without being unduly distracted;
- Making simple work-related decisions;
- Asking simple questions or requesting assistance;
- Accepting instructions and responding appropriately to criticism from supervisors;
- Getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes;
- Responding appropriately to changes in a routine work setting;
- Dealing with normal work stress; or
- Being aware of normal hazards and taking appropriate precautions.

Claimant made and kept friends; she and Dr. Hansen never discussed her ability to work with peers, work under stress, or be aware of hazards; and Dr. Hansen always

---

[11] "Cognitive behavioral therapy (CBT) is a common type of talk therapy (psychotherapy). [Patients] work with a mental health counselor (psychotherapist or therapist) in a structured way, attending a limited number of sessions. CBT helps [patients] become aware of inaccurate or negative thinking so [they] can view challenging situations more clearly and respond to them in a more effective way." Mayo Clinic, Cognitive behavioral therapy, Overview, https://www.mayoclinic.org/tests-procedures/cognitive-behavioral-therapy/about/pac-20384610.

noted that Claimant had an "okay" memory, which renders his statement that Claimant would have trouble with instructions unsupported. The notion that Claimant would have trouble with neatness and cleanliness is contrary to the treatment notes because Dr. Hansen always found Claimant to have adequate hygiene and Claimant described herself as a "perfectionist." (*Id.* at 679, 680, 682, 686.)

Fourth, regarding the list of signs and symptoms on page 569 of the opinion that Dr. Hansen checked off that he said Claimant experienced, most of these signs and symptoms were never discussed, at least not that they are documented in treatment notes, even though Dr. Hansen attempts to individualize the list by adding notes such as "losing her house" to the check box about recurrent and intrusive recollections of trauma or "legs constantly moving" to the check box about psychomotor agitation. (*Id.* at 569.) There is no discussion of losing a house and no notation of leg moving in Dr. Hansen's treatment notes for the first three appointments. Likewise, Claimant always denied anhedonia. While Claimant did state at her first appointment that she felt frustrated and worthless, she denied feeling worthless and hopeless at subsequent appointments. Sleep disturbance was always the focus of discussion during the appointments.

The opinion is written on a checkbox form, provides little supporting comment, and no citation to medical evidence, which makes it of little evidentiary value. *See Wildman*, 596 F.3d at 964. Accordingly, the treatment notes from the appointments prior to Dr. Hansen writing his opinion do not support the opinion.

The appointments subsequent to Dr. Hansen writing his opinion also do little to provide post-dated support for the opinion. At every appointment for the next eleven months, Dr. Hansen found Claimant's judgment adequate; insight marginal; memory, speech, concentration, eye contact, and rapport okay; affect congruent; and mild to moderate depression. (*Id.* at 688-89, 691-92, 694-95, 697-98, 701, 704, 711-12, 715.) On her self-evaluations, Claimant denied feelings of worthlessness, hopelessness, or

anhedonia, and described her depression as mild to moderate. (*Id.* at 688, 691, 694, 697, 700, 704, 711, 715.) Dr. Hansen and Claimant continued to discuss techniques to help Claimant with her sleep issues and situational stress related to family, particularly as it related to Claimant's niece. (*Id.* at 688-89, 691-95, 698, 702, 711-12, 716.) Dr. Hansen opined that the stress with Claimant's niece was likely exacerbating Claimant's pain because it caused Claimant to become angry. (*Id.* at 689.) In January 2018, Claimant and Dr. Hansen discussed Claimant's feelings of worthlessness because Claimant dropped a can of soup due to neuropathy in her hands. (*Id.* at 703, 705.) Dr. Hansen encouraged Claimant to focus on the positive support she received from her mother and sisters, who did not think she was worthless. (*Id.* at 705.) Claimant's mood had "at least a moderate boost" when she took proactive steps to find her own housing. (*Id.* at 716.) Moreover, Claimant reported close family and friend relationships (*Id.* at 680) and no hopelessness or anhedonia (*Id.* at 680, 682, 685), which does not indicate a finding of anhedonia.

Claimant's Counsel is correct that Dr. Hansen consistently found she had marginal insight and a depressed mood. However, this does not mean that Claimant's depression rose to the level of a severe impairment. Dr. Hansen never characterized Claimant's depression as severe in his treatment notes. On only one occasion did Claimant and Dr. Hansen discuss Claimant feeling down or worthless. (*Id.* at 703-05.) Claimant felt this way because she was dropping things due to hand neuropathy. (*Id.* at 703.) Claimant also discussed situational stressors due to her niece living in the house. (*Id.* at 689-90, 692-93, 989-99, 708-09, 711-12, 714-15.) Situational stressors cannot provide the basis for a disability finding. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010); *Dunahoo v. Apfel*, 241 F.3d 1033, 1040 (8th Cir. 2001). Most of Claimant's discussions with Dr. Hansen focused on sleep problems. (*Id.* at 680, 683-84, 687, 689, 692, 695, 697-98, 700-02, 703.) Moreover, Dr. Hansen treated Claimant only with conservative

once-a-month therapy sessions and homework such as tapes and exercises, which does not indicate the disabling level of depression he outlined in his opinion. A conservative course of treatment can weigh against a claim of disabling impairment. *See Milam v. Colvin,* 794 F.3d 978, 984 (8th Cir. 2015).

Nothing in these post-opinion notes supports the opinion. Therefore, Dr. Hansen's June 19, 2018 affirmation of the original opinion does nothing to salvage the original. Accordingly, I find that the ALJ was correct that the opinion is not supported by Dr. Hansen's "own contemporaneous treatment notes." (*Id.* at 16.) This factor does not weigh in favor of giving the opinion more than little weight.

### d. Consistency

"Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). The ALJ concluded that "observations of other treatment providers" did not support Dr. Hansen's opinion. (*Id.*)

Claimant's Counsel argues that the ALJ improperly relied on the opinions of the state agency psychological consultants, including the opinion of Carroll D. Rolland, Ph.D., who examined Claimant for the state. (Doc. 14 at 11 (citing *Kelly v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).) Although the ALJ gave the state agency consultants' opinions great weight, Counsel argues that the consultants did not provide good reasons for the ALJ to disregard Dr. Hansen's opinion because Dr. Rolland examined Claimant on November 5, 2016 (*Id.* at 474) and the state agency consultants reviewed the records and rendered their opinions on November 17, 2016 and February 23, 2017 (*Id.* at 57, 71), all before Dr. Hansen's opinion was part of the record. (Doc. 14 at 5-6.) Thus, according to Counsel, the state agency consultants rendered their opinions without full information, including Dr. Hansen's opinion and other later-included records. (*Id.*)

19

Claimant testified that she saw Dr. Hansen for pain and depression and that he helped her understand that when she was depressed, she was more stressed and felt more pain in her hands and feet. (*Id.* at 33.) Claimant's other healthcare providers consistently rated her mental health as normal. (*Id.* at e.g., 301, 335, 337, 339-340, 342, 346-47, 349, 351-352, 354, 358, 360, 363-64, 366-367, 399, 407, 415, 422-23, 428, 435, 444, 516, 518, 520, 522, 524, 527-28, 530, 532, 603, 746-47, 772-74, 779-81, 818, 830, 835, 844, 846, 894, 907-08, 911, 923, 925, 932, 944.) Even when Claimant was scared because she was having so much pain in her legs that she had to call her sister to pick her up from work and she was "distressed" in the doctor's office, she had a normal mood, affect, behavior, judgment, and thought content. (*Id.* at 349.) Having a diagnosis of depression does not automatically mean the depression was disabling. In fact, on January 26, 2018, almost a year after she started seeing Dr. Hansen, Claimant reported to Dr. Renee Buchanan that she had "no anxiety an no depression." (*Id.* at 931.)

Claimant's Counsel notes that Claimant sometimes cried during doctor appointments. This is true. However, in half of the treatment notes cited by Claimant's Counsel, he admits that Claimant was crying due to pain. (Doc. 14 at 6 (citing AR at 301, 340, 348).) Crying when in pain is not a sign of mental impairment. The other treatment notes cited by Claimant do not indicate a disabling mental impairment.

On March 31, 2015, Claimant was "so upset over" the situation with her niece that she told her primary care physician her mother was "slowly dying from [her niece]." (*Id.* at 343.) Claimant's "pain was worse from her tramdol [sic] than ever before" and her feet were "very sore [and Claimant did not] take socks off" for her diabetic examination. (*Id.* at 343-44.) It is not clear whether Claimant cried over worry for her mother or because of pain. Even if Claimant cried because she was worried about her mother, occasional worry over the well-being of a family member—even worry that results in tears—is also not a sign of a severe mental impairment.

On March 13, 2017, Claimant presented to her primary care provider, Dr. Stahlberg, with community-acquired pneumonia. (*Id.* at 601.) Claimant was "down" because her family was upset with her for smoking, she was in pain and out of pain medication, and she cried. (*Id.* at 602.) On February 13, 2018, Claimant presented to Dr. Stahlberg for a diabetes recheck and reported concerns with her niece and stress at home and she cried. (*Id.* at 888.) Neither of these treatment notes supports a finding of a severe mental health condition or anything other than situational stressors or a normal reaction to pain. Even when Claimant cried, most of her mental status examinations were still normal, whether Claimant cried as a reaction to pain or to stress. (*Id.* at 301, 340, 344, 603, 889.) Claimant did have one other-than-normal notation in this series of treatment notes. When she presented to Dr. Stahlberg on the day she had to leave work because her legs hurt so much that her sister had to pick her up from work, she was hyperventilating and having a panic attack. (*Id.* at 348.) However, one documented panic attack in a 950-page record cannot provide the basis for a finding of a debilitating impairment. The treatment notes from Claimant's other providers also demonstrate that Claimant's physicians seemingly found Claimant's tears appropriate, either as a reaction to pain or to family concerns.

Dr. Rolland examined Claimant for the state agency on November 5, 2016. (*Id.* at 474-78.) Claimant told Dr. Rolland that she was unable to work due to peripheral neuropathy, diabetes, and because she fell asleep at work, which was a side effect of her prescription medication. (*Id.*) Claimant reported that she got along well with employers and coworkers, denied any depression or anxiety, and said she was able to carry out all activities of daily living. (*Id.* at 476-77.) Dr. Rolland found Claimant's memory intact and thought processes goal directed. (*Id.* at 477.) She also found that Claimant related well to others in a work setting, was able to exhibit appropriate judgment, and had good

insight. (*Id.* at 478.) Dr. Rolland noted that Claimant was frustrated by being unemployed. (*Id.*) Dr. Rolland noted "[n]o significant psychopathology." (*Id.*)

Dr. Mark Becker reviewed the record for the state agency on November 17, 2016 and found Claimant had no limits or difficulties caused by mental impairments. (*Id.* at 57.) He noted that Claimant received mental health treatment from her primary care provider who prescribed antidepressant medication "secondary to an attempt to reduce peripheral neuropathy." (*Id.*) He also noted that in spite of being referred to a counselor, there were no records of Claimant seeing a counselor. (*Id.*) Dr. Becker concluded that Claimant did "not have a severe mental health diagnosis and mental health allegations are non-severe." (*Id.*) On February 23, 2017, Dr. Russell Lark affirmed the opinion. (*Id.* at 71.)

The ALJ gave these state agency consultant opinions' great weight because they were consistent with the overall record. (*Id.* at 16.) The ALJ found it significant that Claimant denied any mental impairments during her examination with Dr. Rolland. (*Id.*) These opinions support the ALJ's decision.[12]

Based on the above discussion, I find that the ALJ was correct in concluding that "the observations of other treatment providers" did not support Dr. Hansen's opinion. This factor does not weigh in favor of giving the opinion more than little weight.

### e. Specialization

"[G]enerally [the ALJ will give] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). Dr. Hansen is a licensed

---

[12] As will be discussed in Part III.A.2.f., *infra*, Claimant takes issue with the consultants' opinions.

psychologist with a doctorate in psychology who gave an opinion in his area of expertise. Therefore, this factor is weighs in favor of giving the opinion more than little weight.

### f. Other Factors

Claimant's Counsel asserts the following:

> On February 7, 2018, agency nonexamining psychological consultant Don B. Johnson, Ph.D., agreed with the disability examiner's mental assessment in her "416." (TR 707). In short, the agency psychological consultant in 2018 believed additional evidence would need to be reviewed to determine if Ms. Marion had a severe mental impairment in light of Dr. Hansen's 2017 opinions, even accounting for the consultative examiner's report and earlier psychological consultant opinions that were already in the file.

(Doc. 14 at 5 (citing *id.* at 707).) The "416" that Claimant asserts Dr. Johnson agreed with was an SSA disability examiner's ("the disability examiner") January 19, 2018 medical evaluation, which was completed on a form called SSA-416. (AR at 78-82.) In this form, the disability examiner, who had the benefit of reviewing more records than the state agency consultants did, including Dr. Hansen's opinion, concluded, in pertinent part, that "additional psychological records would be necessary to determine if the claimant's impairment [had] worsened and is now considered severe and warrants assessment." (*Id.* at 81.)

The Commissioner responds that Dr. Johnson's entire statement was, "Mental review completed, see 416 and I agree with the mental assessment." (Doc. 15 at 9 (citing AR at 707).) The Commissioner argues that the 416 was the evaluation by the state agency consultants. (*Id.*) Indeed, the form the consultants completed is called "416— MEDICAL EVALUATION." (AR at 56, 70.) Thus, the Commissioner asserts that Dr. Johnson actually agreed with the consultants' conclusion that Claimant's mental impairments were nonsevere. (Doc. 15 at 9-10.) The Commissioner argues that the consultant who suggested needing more psychological records on January 19, 2018 was a disability examiner who did not complete a 416. (*Id.* at 10.) However, even if more

records were required, the Commissioner points out that the ALJ did consider further psychological records from Dr. Hansen and found Claimant was more limited than what the state agency medical consultants found. (*Id.*)

I find that the Commissioner is most likely correct because the disability examiner's "416" is not really so much an assessment of Claimant's mental status as a synopsis of the evidence available at the time and a roadmap for future activity needed in the case. (AR at 78-82.) That being said, I also agree with the Commissioner that the administrative record contains the type of records the disability examiner stated were required to complete the administrative record. (*Id.* at 81.) Therefore, final resolution of "which 416" Dr. Johnson was referring to need not distract the Court further because the following analysis will progress as if more treatment notes were required and supplied.

The record contains treatment notes from Dr. Hansen dated after January 19, 2018, the date the disability examiner said more records were needed. (AR at 703-16.) The record also contains treatment notes from other physicians subsequent to January 19, 2018 that contain mental status evaluations. (*E.g., id.* at 746-47, 772-74, 779-81, 894, 907-08, 911, 923, 925, 932.) Thus, to the extent the record required development, that development occurred. Moreover, the ALJ considered the evidence before her not at the time the state agency consultants wrote their opinions, but at the time of her decision, and did not agree with the consultants that Claimant had no mental limitations. Based on the entire record, the ALJ found that Claimant had mild limitations in understanding, remembering, or applying information, and concentrating, persisting, or maintaining pace. (*Id.* at 13.) Therefore, this argument does not undermine the ALJ's conclusion regarding the weight assigned to Dr. Hansen's opinion.

Claimant's Counsel also takes issue with the findings of the state agency consultants, including Dr. Rolland, who examined Claimant. Claimant does not

necessarily argue with the consultants' findings, but argues with the timing of their opinions, averring that they were rendered based on an incomplete record because the consultants were denied Dr. Hansen's opinion. (Doc. 14 at 4.) Claimant's Counsel asserts the following:

> The ALJ rejected Ms. Marion's reports concerning her mental impairments based largely on the results of a consultative examination. A consultative examiner had noted in November of 2016 that Ms. Marion denied 'significant and depression and anxiety' and concluded Ms. Marion had no psychopathology. The agency psychological consultants then relied on the consultative examiner's conclusions. The ALJ did this despite the opinions from Ms. Marion's treating psychologist that indicated her depression was clearly a severe impairment.

(*Id.* (internal citations omitted).)

That Claimant did not seek mental health treatment until nine months after she applied for benefits was completely in Claimant's control, especially when Dr. Stahlberg told her to seek counseling as early as March 31, 2015. (AR at 344.) On September 22, 2016, Dr. Stahlberg noted that Claimant did not want to participate in counseling. (*Id.* at 350.) It was Claimant's burden to provide evidence to support her claim. *See Eichelberger*, 390 F.3d at 591 (claimant is responsible for providing evidence used to determine RFC). Moreover, it is not unusual for a claimant's treating source opinion to be entered into the record long after state consultants file their opinions because state consultants render their opinions early in the administrative process. *See Zortman v. Berryhill*, No. 18-CV-4035-LTS, 2019 WL 2111519, at *7 (N.D. Iowa May 14, 2019), (citing *Minney v. Berryhill*, No. C16-175-LTS, 2018 WL 659860, at *8 (N.D. Iowa Feb. 1, 2018) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's

decision in reliance on it.")), *R. & R. adopted sub nom. Zortman v. Saul*, No. C18-4035-LTS, 2019 WL 3890925 (N.D. Iowa Aug. 19, 2019).

This timing may be unfortunate, but it does not require remand, especially in a case where the ALJ clearly did not rely exclusively on the opinions of the state agency reviewing and examining consultant opinions, even though she gave them great weight. (AR at 16.)  As previously discussed, the ALJ rejected Dr. Hansen's opinion because it was not supported by his own treatment notes or the "observations of other treatment providers," findings that are supported by the evidence in the record. Therefore, I am not persuaded that even if the state agency consultants had read Dr. Hansen's opinion, they would have changed their own opinions after comparing Dr. Hansen's opinion to the record as a whole.  This, in turn, would likely not have changed the ALJ's decision on this issue.

### g.     Conclusion

After a thorough review of the entire record, I find that the ALJ's decision regarding Dr. Hansen's opinion is supported by substantial evidence on the record as a whole and should not be disturbed.  I recommend that the ALJ's decision on this issue be affirmed.

### B.     The ALJ did not properly evaluate Claimant's Subjective Complaints and the ALJ erred by failing to discuss Claimant's mother's report.

Claimant's Counsel argues that the ALJ did not properly evaluate Claimant's subjective complaints.  Counsel also argues that the ALJ erred by failing to mention Claimant's mother's third-party function report in her decision.

### 1.     Claimant's Subjective Complaints

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on

[the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id*. § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[13] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id*. § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.

---

[13] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

In this case, the ALJ found that Claimant had medically determinable impairments that could reasonably be expected to cause her alleged symptoms. (AR at 16.) The ALJ also found that Claimant was able to perform her past relevant work as an accountant or accounts payable clerk because the work was not precluded by her RFC. (*Id.*)

Claimant's Counsel is correct that Claimant's work history, which was not discussed by the ALJ, "was one that supports her claim as it shows she likely would have been working if she physically and mentally could." (Doc. 14 at 15.) *See Milam v. Colvin*, 794 F.3d at 985 (quoting *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998)). However, failure to mention work history is not reversible error if the ALJ's credibility determination is otherwise supported. *Roberson v. Astrue*, 481 F.3d 1020, 1025-26 (8th Cir. 2007) (declining to reverse the decision based on ALJ's failure to discuss claimant's work history and reasoning that while "[i]t might have been better if the ALJ had referred specifically to Ms. Roberson's work record when determining her credibility . . . . [,] we do not think that the ALJ was required to refer to every part of the record, and we think that the portions of the record that he referred to were sufficient to support his credibility determination.").

Claimant's Counsel takes issue with the ALJ's assessment of the following *Polaski* factors: the objective medical evidence, her daily activities, and compliance with her treatment.

### a. *Objective Medical Evidence*[14]

Claimant's Counsel argues that although the ALJ discussed examination findings and imaging, she never mentioned "the frequent occurrences of Ms. Marion being unable

---

[14] Although not a *Polaski* factor, the objective medical evidence is often discussed along with *Polaski* factors because of the way the rules are delineated.

to have her feet examined due to burning pain. This is prevalent in the record and impossible to miss." (Doc. 14 at 15 (citing Doc. 13 at 3-12).)

The Commissioner responds that the ALJ properly considered the inconsistencies between Claimant's subjective complaints and the objective medical evidence. The Commissioner asserts that Claimant "typically had normal gait, strength, and sensation and feet were stable" and no edema or tenderness. (*Id.* (citing AR at 14, 15, 298, 326, 351, 400, 806, 818, 889-890).) The Commissioner also argues that Claimant worked for years with foot pain and there is no indication there has been an acute change in symptoms, which demonstrates that she was able to perform her past relevant work with her impairment. (*Id.* (citing AR at 14, 296).) The Commissioner also argues that because Claimant complained of hand pain "for many years" while she was still working in 2016, she could not rely on that symptom as a basis for a disability claim. (*Id.* (citing AR 578; *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008); *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).)

While the Commissioner has cited pages that documented normal gait, strength, sensation, stable feet, and no edema or tenderness, some of the pages he cited also document foot pain. For example, on July 13, 2015, Claimant reported to neurologist Shawna Westermann for an evaluation. (AR at 296-98.) Dr. Westermann documented foot tenderness upon superficial palpation and pain when Claimant's toes were moved up and down. (*Id.* at 298.)[15] Dr. Westermann noted that ACE wraps and compression stockings were too painful for Claimant to wear. (*Id.*) She also noted that Claimant had recently given up bowling due to pain, which was Claimant's favorite activity. (*Id.*) Moreover, when Claimant presented to the emergency room for hand pain on July 2,

---

[15] This treatment note is also dated July 13, 2015, which is two months prior to Claimant's alleged onset of disability date of September 15, 2015.

2016, she was given Dilaudid, which decreased the pain from 10/10 to 1/10. (*Id.* at 326.) Therefore, the emergency room physicians believed Claimant's claims of pain were not overblown. Claimant had checked her blood sugar that day. (*Id.* at 323.) On July 13, 2016, Dr. Judith Renee Buchanan documented decreased temperature sensation in Claimant's right hand and ankles, and exquisite sensitivity to light touch in both lower extremities. (*Id.* at 400.) Claimant's Achilles reflexes could not be tested due to pain. (*Id.*) On February 13, 2018, Claimant saw Dr. Stahlberg for a diabetes recheck. (*Id.* at 888-89.) While Dr. Stahlberg noted no edema, she did note that Claimant had "limits with her hand and also drops things. She says she is weak." (*Id.* at 888.) Claimant's diabetes was well-controlled without complications. (*Id.* at 890.) Claimant needed to exercise. (*Id.*)

Of the seven treatment notes cited by the Commissioner, only three state Claimant had a stable gait. (*Id.* at 326, 400, 808.) Furthermore, notes at AR 808 and 818 appear to be duplicates. Moreover, while the treatment notes do document no edema, Claimant never stated that edema was disabling her. She always maintained that pain and tenderness in her feet and lower legs was so severe that it interfered with her daily activities, even her sleep. At times, Claimant did not want to take her shoes off during doctor appointments because her feet hurt, did not want her feet checked because it was too painful, and said putting on socks felt "like razor blades." (*Id.* at 296, 522, 531, 858-59.)

Claimant testified that she was 5'-1" tall and weighed 145 pounds. (*Id.* at 27.) She further testified that at home she had a special mat on her kitchen floor of the type people who work at stores stand on that helped cushion the floor so she could "tolerate [standing] long enough" to cook a hamburger or other quick meal. (*Id.* at 37.) Her mother, niece, or sisters had to get heavier pans out and put them on the stove for her. (*Id.*) However, she stated that "a lot of times" her meals consisted of "chips or

something." (*Id.*) Claimant also testified that she could not "take a step without [her] shoes on" because she could not put pressure on her feet. (*Id.* at 37-38.) She further testified that she had to wear socks at all times, even in bed, because she could not stand the pressure of even the sheets touching her feet and that she could not wear tight pants such as leggings because she could not get them over her feet. (*Id.* at 38.) She said that she could not run, could walk 50 yards "if [she] was lucky," and that most of the time, she could walk less than ten yards. (*Id.* at 35.) She also testified that it was worse for her to stand than walk, although doing both hurt her. (*Id.* at 36.) She explained that it was not that her "unsteadiness is off, my—the problem is the pain I get from just walking, and the more pain I'm in, the funkier my walk gets and then it gets to a point where I can't walk at all." (*Id.* at 36.) She said she had an unprescribed wheelchair that she used when out shopping or at events such as fairs. (*Id.*)

Claimant also testified that she had pain and little-to-no strength in her right hand. (*Id.* at 34-35.) She said she could not lift a gallon of milk or a small cast iron skillet and that she had dropped a small bowl containing food because she did not have the strength to hold it. (*Id.* at 35.) In January 2018, Claimant told Dr. Hansen that she dropped a can of soup due to neuropathy and that this had been happening more often during that time period. (*Id.* at 703.)

The ALJ noted that the objective medical evidence did not support a finding of neuropathy because 2010 EMG and nerve conduction studies of Claimant's feet returned normal results and that Claimant's examinations were typically normal for gait, strength and sensation. (*Id.* at 14.) The ALJ did concede that Claimant has been clinically diagnosed with neuropathy by her treatment providers. (*Id.*) The ALJ also noted that while Claimant was diagnosed with ulnar neuropathy across the right elbow in July 2016

and "upon later examination" had a positive Wartenburg's sign bilaterally,[16] her treatment for hand pain had been "occasional, at best." (*Id.*) The ALJ stated that Claimant told emergency room physicians in July 2016 that she had hand pain for years with no acute change in symptoms, which the ALJ found indicated that Claimant could work with the pain. (*Id.*) Claimant also had intact strength and only had altered sensation after her January 2017 stroke, which resolved. (*Id.* (citing AR at 932).) Therefore, the ALJ concluded that Claimant's upper-extremity neuropathy was not as severe as alleged. (*Id.*)

I find that the ALJ incorrectly interpreted the record on this issue. While the ALJ recited the results of radiographic and other imaging tests correctly, she did not recite the statements of Claimant's physicians correctly from the pages she relied on to support her findings. As discussed above, the ALJ did not mention the times Claimant's feet were so painful she did not want to remove her shoes to have them examined. She also did not mention the times in Exhibit 2F, the exhibit she cited for support, when Claimant's foot exams were abnormal and where Claimant's inability to wear compression stockings due to pain was discussed. (AR at 298, 301.) Furthermore, the treatment notes in Exhibit 2F predate Claimant's alleged onset of disability date. (*Id.* at 295-311.) Claimant's ability to maintain normal gait during short appointments does not necessarily translate to an ability to walk/stand two hours during a normal workday, especially when Claimant left her sedentary accounting job in tears in June 2016 due to leg pain. (*Id.* at 348.) This was after telling Dr. Stahlberg in January 2016 that she hoped the job would become permanent because she wanted to move into her own home. (*Id.* at 353.) At that same

---

[16] Wartenberg's sign is "persistent abduction of the little finger." P. Voche & M. Merle, *Wartenberg's Sign: A New Method of Surgical Correction*, Feb. 1995 J. Hand Surg. Br., at 49-52, Nat'l Ctr. for Biotech. Info., U.S. Nat'l Lib. Med, NIH, https://www.ncbi.nlm.nih.gov/pubmed/7759935 (quoting abstract).

appointment, Dr. Stahlberg noted edema, tenderness, and neuropathy with an exaggerated pain response. (*Id.* at 348-49.) Claimant was prescribed Percocet. (*Id.* at 349.) Claimant reported foot pain to her health care providers several times. (*E.g., id.* at 353, 360, 362, 403-04, 411, 531, 858.)

Regarding Claimant's hand problems, although the ALJ stated that Claimant's altered sensation resolved after her stroke, the treatment note the ALJ cited to support this statement states that Claimant continued to have "decreased sensation right face and arm." (*Id.* at 932.) This treatment note was authored six months prior to the hearing on this matter. (*Id.*) The ALJ also seemed to miss part of the point regarding Claimant's hand issues. Claimant testified that before her stroke, her hand pain was confined to the last two fingers of her right hand, but since the stroke, the pain affected her whole hand and was worse in her right hand than her left hand. (*Id.* at 34-35.) As noted above, Claimant told Dr. Hansen in January 2018 that dropping things was becoming more common for her, which she found "discouraging." (*Id.* at 704.) Therefore, it seems that while Claimant had hand pain prior to her stroke in January 2017 (*Id.* at 932), the pain became more wide-spread and her ability to hold onto things became more of an issue after her stroke. (*Id.* at 858 ("Can't use her hands she can't lift"); 888 (hand weakness and dropping things).) No healthcare provider opined that Claimant malingered or exaggerated her symptoms.

After a proper re-evaluation of the record, the ALJ may come to the same conclusion, but I do find that remand is necessary for an ALJ to re-evaluate the objective medical evidence in the record that relates to Claimant's hand and foot pain.

### b. *Daily Activities*

The ALJ stated the following regarding Claimant's daily activities:

Regarding her daily living activities, the claimant testified that she can cook simple meals, wash dishes, do laundry, and care for her dog. Furthermore, in February 2017, the claimant reported that she was [sic] watched a three-

year-old child that day. (Exhibit 12F/18) These activities indicate that she is much more physically capable than alleged, especially regarding her complaints of hand and feet pain. While the claimant said she takes nap [sic] during the days for no more than two hours, there is nothing in the record that shows napping is medically necessary.

(AR at 16.)

Claimant's Counsel argues that the ALJ mischaracterized Claimant's hearing testimony and the record. (Doc. 14 at 13.) The Commissioner responds that not only did Claimant engage in the activities cited by the ALJ, but also did yard work after her alleged onset of disability date. (Doc. 15 at 14.) The Commissioner also argues that the ALJ could rely on Claimant's daily activities to support her decision, even though they were not performed at the level of work activity. (*Id.* at 14-15 (citing *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012); *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007).)

While the record is clear that Claimant could, indeed, cook simple meals, Claimant's testimony made it clear that she could only do so with the modifications she employed in her home. She had a special mat that cushioned her feet and allowed her to walk, but not stand, long enough to complete simple meals, such as a hamburger. (AR at 37.) She needed assistance with heavy pots and pans. (*Id.*) Thus, it appears that being able to cook simple meals did not necessarily indicate that Claimant was more physically capable than alleged. Claimant consistently maintained she had foot pain when walking and standing, and problems with hand strength and dexterity. The modifications Claimant described in her cooking routine were consistent with her claims.

Regarding taking care of a three-year-old, Claimant's Counsel notes that "[t]his shows up in a [treatment] note with Dr. Stahlberg." (Doc. 14 at 14 (citing AR at 531).) The entire entry states, "She watched a three year old today." (AR at 531.) Claimant's Counsel is correct that the entry does not include any details regarding whether Claimant

did so alone or with another family member, if she actually engaged in any activities with the child or if the child was napping, how long she watched the child, etc. (Doc. 14 at 14.) This is relevant information because the same treatment note states that Claimant's feet were so painful that Dr. Stahlberg could not examine them that day and that while Claimant's arm was recovering from the stroke, she still could not lift anything heavy. (AR at 531.) If the ALJ was going to rely on this as a reason to deny benefits, she should have inquired as to the meaning of this one stray comment in the entire record. She did not. Instead, she apparently gave it outsized importance without considering the context in which it was made and without trying to find out the facts surrounding the statement by asking Claimant about it at the hearing. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (remanding case for proper consideration of the record after ALJ denied benefits based on erroneous inferences he drew from the record).

The ALJ also said that Claimant could do laundry. Claimant testified that she could do laundry and stated in her adult function report that she could do laundry. (*Id.* at 40, 210.) However, Counsel notes that Claimant transferred clothing one item at a time from the washer to the dryer and had to ask for help carrying the clothes up the stairs from the basement where the washer and dryer were located. (Doc. 14 at 13.) Claimant testified that someone else brought the clean laundry up the stairs for her. (AR at 40.) This was consistent with Claimant's function report filed on August 16, 2016. (*Id.* at 210.) Likewise, while the ALJ stated that Claimant cared for the family dog, Claimant testified that she merely "let the dog in and out to go to the restroom." (*Id.*) She did not take the dog for walks. (*Id.*) The ALJ did not mention that Claimant did not walk the dog. (*Id.* at 16.)

The laundry and dog care are a mixed bag. Claimant clearly could do some laundry related activities and provide some pet care. However, Claimant did so with help from her family. (*Id.* at 40, 209.) These facts did not justify a finding that Claimant

was "more physically capable than alleged." (*Id.* at 16.) Therefore, the ALJ did not properly weigh these daily activities.

Counsel also argues that the ALJ's statement that Claimant could wash dishes does not implicate that Claimant could do more physically than alleged because Claimant testified that she could not wash bigger plates or pots and pans by herself. (*Id.* (citing AR 39 ("I can do the silverware and small plates, and the bowls . . . but then when it comes to the bigger plates and pots and pans, [family members] have to help me, I can't lift them. I can somewhat with the left, but when you're right dominant, it's like doing some things backwards and it's like –it just don't work out very well.").) There is no contrary evidence in the record and this testimony is consistent with statements Claimant made to her healthcare providers and the observations of an SSA official who noted Claimant had trouble opening her purse and unfolding a medical report on July 22, 2016 when she reported for a disability interview. (*Id.* at 199.) Therefore, the ALJ did not properly weigh evidence related to these activities.

The cases cited by the Commissioner are distinguishable. The Commissioner cites the cases for the proposition that the ALJ can rely on activities even if they are not performed at the work activity level. (Doc. 15 at 14-15.) *Anderson v. Astrue* did not address whether an ALJ properly relied on daily activities performed at a work activity level. 696 F.3d 790, 794 (8th Cir. 2012). Rather, *Anderson* addressed a dispute over how an ALJ weighed the opinions of a treating physician and held that "if a doctor evaluates a patient as having more physical limitations than the patient actually exhibits in her daily living, an ALJ need not ignore the inconsistency." *Id.* *Wagner v. Astrue* can be distinguished on the facts. 499 F.3d 842 (8th Cir. 2007). In *Wagner*, the court agreed with the ALJ that the claimant's testimony was not fully credible because "'the claimant continues to participate in activities of daily living with minimal limitation' and because of 'inconsistencies cited within the record by the State agency physicians.'" *Id.*

36

at 852.  The claimant engaged in a full range of daily activities, both at home and in the community.  *Id.*  Claimant in the case at bar, however, did very little other than stay at home and watch television.  (AR at 37-42.)  Importantly, Claimant's Counsel does not take issue with the proposition that daily activities are not usually performed at the work activity level.  The issue is that Claimant was unable to stand on her feet for more than a few minutes at a time, could not walk more than 50 yards (*Id.* at 14), and could not reliably grip anything that had much weight, and thus Claimant's Counsel argues that the ALJ's decision on this issue was not supported by substantial evidence.  The ALJ did not properly account for the accommodations Claimant employed when she performed relevant daily activities.

Moreover, while it is true that Claimant did yard work once since her alleged onset of disability, that is not dispositive of anything.  This is especially true in this case when Claimant injured herself while doing the yardwork.  (*Id.* at 319.)  The ability to perform certain activities occasionally is not inconsistent with a disability finding.  *See Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (The claimant's ability to mow the lawn, help paint a cabin, drive, watch television, and sit in a fishing boat on his "good days" was not inconsistent with his testimony that on his bad days he could not function at all because "[t]he ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work.").  The Eighth Circuit has repeatedly held that a claimant's ability to perform household chores does not necessarily mean the claimant can perform gainful work activity outside the home.  *See Ford*, 518 F.3d at 983 (holding that daily activities of "washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading" were not inconsistent with claimant's claim of pain or with an inability to hold a fulltime job); *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (holding that claimant's ability to fold laundry, shop once a week, watch her children at independent play, drive short distances about three times a

month, and watch television and listen to music before dozing off or losing concentration did not mean she had the ability to work fulltime. "[I]t is well-settled law that a claimant need not prove she [or he] is bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations and internal quotation marks omitted).

I find that the ALJ did not properly evaluate Claimant's daily activities.

### c. *Compliance with Treatment*

The ALJ found that Claimant continued to smoke despite multiple recommendations that she stop. (AR at 15.) The ALJ stated, "Smoking cigarettes is inconsistent with the claimant's complaints of shortness of breath and the inability to work." (*Id.*) The ALJ also noted that Claimant did not check her blood sugars in April 2018. (*Id.*)

Claimant's Counsel does not dispute that Claimant was cautioned to stop smoking multiple times. Indeed, my review of the record indicates that Dr. Stahlberg and Dr. Buchanan consistently counseled Claimant to stop smoking. Rather, Counsel argues that Claimant smoked due to an addiction to nicotine and because of stress. (Doc. 14 at 14 (citing AR at 531).) Claimant testified that she was trying to quit. (AR at 36.) Counsel also cites a Seventh Circuit case that holds the following:

> We note that even if medical evidence had established a link between smoking and her symptoms, it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health.

*Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).

I decline to follow the reasoning of *Shramek* for two reasons. First, the case is not binding on this Court. In the Eighth Circuit, failing to follow a physician's advice to

quit smoking can be considered when determining a claimant's credibility. *See Guziewicz v. Barnhart*, 114 F. App'x 267, 269 (8th Cir. 2004) (claimant failed to comply with advice to quit smoking) (citing, *inter alia*, *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)("ALJ properly considered claimant's failure to follow doctor's advice to stop smoking in discrediting her subjective complaints")); *see also Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("failure to follow prescribed medical treatment without good cause is a basis for denying benefits") (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)). Second, while Claimant was under stress at various times due to her family situation (AR at 531), I can find no notation in any treatment note where Claimant told healthcare providers that she tried to stop smoking. In fact, Claimant told Dr. Stahlberg on more than one occasion that she did not want to quit smoking. (*E.g., id.* at 353, 521, 831.) This in spite of repeated complaints of being short of breath and coughing. (*E.g., id.* at 351, 521, 588, 876, 907.)

Regarding Claimant's failure to check her blood sugars in April 2018, Counsel argues that "the ALJ did not adequately account for Ms. Marion's depression symptoms, which included anhedonia, the ALJ could not possibly fairly or accurately determine the importance of such limited noncompliance during one month in 2018, several years into Ms. Marion's claim." (Doc. 14 at 15.) First, I have already found that Dr. Hansen's finding that Claimant had anhedonia was not supported by his own treatment notes or the record as a whole. Thus, to the extent Claimant's Counsel was basing an argument on this impairment, I find that argument to be without merit. Second, I agree that this noncompliance was an isolated incident. Claimant was usually compliant with monitoring her blood sugars. (*E.g.* AR at 521, 858.) However, as Claimant's Counsel notes, this is but one isolated issue in a much bigger record analyzed by the ALJ, and I find that the ALJ decision did not significantly rely on this single finding, especially when Claimant's failure to comply with repeated admonitions to stop smoking went unheeded. Therefore,

remand is not required for the ALJ to reweigh this one page of the record, especially when the ALJ correctly noted that it was but one documented day of failed testing.

### d.    Remaining *Polaski* *Factors*

Claimant's Counsel does not proffer arguments related to the other *Polaski* factors. I find that the ALJ properly "acknowledged and examined considerations" related to the other *Polaski* factors.  *Lowe*, 226 F.3d at 972.

### e.    Conclusion

I recommend remand for the ALJ to reconsider the following factors related to Claimant's subjective physical complaints: the objective medical evidence and Claimant's daily activities.

## 2.    *Claimant's Mother's Third-party Function Report*

Claimant's Counsel argues that the ALJ's "credibility errors include a lack of discussion for the report of Ms. Marion's mother, Mary Jane Marion."  (Doc. 14 at 15.) Claimant's mother reported that Claimant had difficulties concentrating, walking, standing, and that she was limited in her daily activities of cooking, housework, and personal care in the same ways as Claimant reported.  (AR at 229-36.)  Counsel avers that this failure led to a credibility determination that was not supported by substantial evidence.  (Doc. 14 at 16.)  The Commissioner argues because the report is cumulative of other evidence, "the ALJ clearly found the third party statements not entirely credible for the same reason that plaintiff's other extreme allegations were not credible—because they lacked substantial support from the record."  (Doc. 15 at 17.)

The Commissioner cites *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011) in support of its argument and Claimant's Counsel cites *Nowling v. Colvin*, 813 F.3d 1110 (8th Cir. 2016) in support of Claimant's argument.

In *Buckner*, the court declined to remand the case for reconsideration of the claimant's girlfriend's statement the ALJ did not mention in the decision. 646 F.3d at 559.

> . . . [W]e cannot determine from the record whether the ALJ considered her statements at all. At the same time, . . . the same evidence that the ALJ referred to in discrediting Buckner's claims also discredits the girlfriend's claims. Specifically, Buckner's girlfriend stated that Buckner cannot watch the children when she leaves the house. As noted above, the ALJ observed that Buckner, in his disability questionnaire and his hearing testimony, "stated that he was able to care for his son." Buckner's girlfriend also claimed that Buckner could not work, would run out of breath easily, and had no energy. Although the ALJ did not address all of these specific claims, the ALJ did find that Buckner's own statements and hearing testimony "show that he engages in a range of daily activities inconsistent with his allegation of disabling hypertension, headaches, back pain, hand cramps, shortness [of] breath, chest pains, depression and anxiety." Finally, the decision here did not suffer from the other deficiencies . . . most notably, as discussed *supra,* the ALJ here did sufficiently assess Buckner's credibility. Thus, we hold that the ALJ's "arguable deficiency in opinion-writing technique," . . . had no bearing on the outcome of Buckner's case and does not require remand.

*Id.* at 560 (internal citations omitted; second set of brackets in original).

> *Nowling* described the practical effect of *Buckner's* holding in that case.

> Citing *Buckner,* the agency argues any error in failing to discuss Dawn Nowling's testimony does not require remand because the same evidence that discredits [Claimant] Nowling's testimony also discredits Dawn Nowling's testimony. *Buckner,* 646 F.3d at 559–60 (denying remand where it was not possible to determine whether the ALJ had considered lay testimony but where it was clear the same evidence that discredited the claimant's testimony would also discredit the lay witness's testimony). The agency's argument in this regard misses the mark. First, it is unclear what exactly the ALJ found not credible about Nowling, other than the conclusion that her symptoms were some unarticulated degree of severity less than she described them to be. In this setting, even without taking into account the peculiarities of a somatoform disorder, Dawn Nowling's

testimony is neither redundant with Nowling's testimony, nor is it discredited by the same evidence that purportedly discredits Nowling's testimony. Rather, Dawn Nowling's testimony serves as a third-party's observation of the symptoms the ALJ appears to have rejected as non-credible subjective complaints. *See Willcockson,* 540 F.3d at 881 ("[W]e question whether witness statements corroborating a claimant's subjective complaints can logically be treated as cumulative by assuming that they would have been rejected for the same reasons that the claimant statements were rejected, where the agency itself says that because subjective complaints are hard to document, it will 'carefully consider' evidence from other persons addressing the extent of the claimant's pain and how it affects his or her ability to function." (quoting 20 C.F.R. § 404.1529(c)(3))).

813 F.3d at 1122 (second set of brackets in original).

Although this case does not fit squarely under either *Buckner* or *Nowling*, it is closer to *Nowling*. The ALJ provided reasons for her decisions on the *Polaski* factors at issue, but I have found that several of those decisions were not well-supported, which distinguishes this case from *Buckner*. Furthermore, unlike the claimant in *Buckner*, Claimant never admitted to doing more activity than originally asserted. Claimant was consistent in her statements of lost function and ability. Furthermore, while Claimant's mother's report contains much of the same substantive information that Claimant provided, it also provides "a third-party's observation of the symptoms the ALJ appears to have rejected as non-credible subjective complaints." *Id.* Therefore, while an ALJ is not required to cite every piece of evidence in the record, *see Wildman*, 596 F.3d at 966 (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)), and failure to mention a piece of evidence does not necessarily mean it was not considered, in this case, the ALJ's decision suffers from not knowing if Claimant's mother's report was considered because the report provided some corroboration for Claimant's consistent claims.

Accordingly, I recommend remand for the ALJ to reconsider Claimant's mother's third-party function report.

**C.** *The ALJ did not err by finding Claimant's mental impairments nonsevere at step two of the five-step process.*

As discussed above, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen*, 482 U.S. at 141 (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). In relevant part, these include "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting." *Id.* Although "severity" is not "an onerous requirement to meet," it is also not "a toothless standard." *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007) (internal citation omitted).

Claimant's Counsel argues that the ALJ did not fully and fairly develop the record concerning Claimant's mental limitations because "the ALJ improperly relied on the old agency psychological consultant opinions called into question by Dr. Johnson's opinion in February of 2018." (Doc. 14 at 5.) Counsel asserts that "[t]he ALJ did not understand what Dr. Johnson had found—apparently thinking Dr. Johnson had signed off on the prior RFC determinations in stead [sic] of the disability examiner's report that additional record development was needed—which further warrants remand for a full and fair development as to Ms. Marion's mental limitations during the relevant period." (*Id.* at 6 (citing *Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017).) According to Counsel, the ALJ's error was not harmless because the ALJ's determination that Claimant did not have severe mental impairments is not supported by the record as a whole and led to the ALJ concluding Claimant could perform her past relevant work, which was of a skilled nature. (Doc. 14 at 8.)

43

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant's mental impairments were not severe. (Doc. 15 at 10.) The Commissioner further argues that even if the ALJ "should have found otherwise, [Claimant] has not shown harm" because the ALJ found Claimant had other severe impairments at step two and because Claimant has provided no evidence that the ALJ would have decided differently had the alleged error not occurred. (*Id.* at 10-11) (citing *Bowen*, 482 U.S. at 156; *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012)).

As discussed in part III.A., *supra*, further development of the record in accordance with Dr. Johnson's directive occurred in this case. The record contains treatment notes from Dr. Hansen and mental status evaluations from other health care providers dated after January 19, 2018. (AR at 703-16, 746-47, 772-74, 779-81, 894, 907-08, 911, 923, 925, 932.) These treatment notes, however, do not support a finding of a severe mental health impairment. While Claimant reported frustration over situational stressors such as her neuropathy and family stress related to her niece, Dr. Hansen consistently noted only mild to moderate depression, adequate judgment, congruent affect, and okay appearance/behavior, speech, dress/hygiene, and eye contact/rapport. (*Id.* at 709-16.) Claimant felt better when she and her family took action to address the situation with her troubled niece living in the family home, whether that was looking for an alternative living situation for herself or her niece. (*Id.* at 714, 716.) Likewise, her other healthcare providers noted normal mental status examinations. (*E.g. id.* at 746-47, 772-74, 779-81, 894, 907-08, 911, 923, 925, 932.) Thus, remand was not necessary to develop the record with post-January 2018 treatment notes. Furthermore, as discussed above, the post-January 2018 treatment notes in the record did not support a finding that Claimant's depression was a severe impairment.

In addition, I have already explained that the ALJ properly gave little weight to Dr. Hansen's opinion because his opinion is neither supported by his own treatment notes

44

nor by the record as a whole. *See* Part III.A., *supra*. Moreover, I agree with the Commissioner that Claimant was not harmed by the ALJ's finding on her mental impairments. "[T]he failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe." *Dray v. Astrue*, 353 Fed. Appx. 147, 149 (10th Cir. 2009). This Court previously addressed this issue in *Berry v. Colvin*, 74 F. Supp. 3d 994 (N.D. Iowa 2015). The following quotation addresses a citation in the Commissioner's brief that also appears in the Commissioner's brief in the case at bar.

> The Commissioner also argues that an ALJ's failure to find a particular impairment severe at Step Two is not reversible error if the ALJ finds at least one other impairment to be severe. Doc. No. 13 at 6. This argument is logical. The purpose of Step Two is "to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Bowen v. Yuckert,* 482 U.S. 137, 156, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (O'Connor, J., concurring). In formulating a claimant's RFC the ALJ must consider the combined effects of all medically-determinable impairments, whether severe or non-severe. *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)). Thus, so long as the ALJ does not terminate the sequential evaluation process at Step Two, there is little basis to argue that the characterization of one impairment as "non-severe" constitutes reversible error. While I accept the Commissioner's argument, I note that her brief includes a quotation that wrongly purports to derive from page 156 of *Bowen. See* Doc. No. 13 at 6. That page, which is part of Justice O'Connor's concurring opinion, does not contain the represented quotation. Nor, so far as I can tell, does that quotation appear elsewhere in any of the *Bowen* opinions. While I have no doubt that this error was inadvertent, I point it out so it will not recur in future briefs.

*Id.* at 1001 n.2; *see also Hill v. Colvin,* No. C14-4105-CJW, 2016 WL 1261099, at *5 (N.D. Iowa Mar. 30, 2016) (reaching the same conclusion regarding the alleged combined effects of impairments). Even if the ALJ had erred in not finding Claimant's mental impairments severe, Claimant has not provided any evidence that the ALJ would

have decided differently if the error had not occurred. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012); *Van Vickle v. Astrue,* 539 F.3d 825, 830 (8th Cir. 2008). Therefore, remand is not required on this basis.

Finally, Claimant's Counsel cites *Gann v. Berryhill*, 864 F.3d 947, 952-53 (8th Cir. 2017) and includes a parenthetical that states the following: "where an ALJ intends to afford significant weight to a medical source opinion, but then does not account for, that opinion in the claimant's RFC, remand is warranted." (Doc. 14 at 8.) In *Gann*, the hypothetical upon which the ALJ based the claimant's ability to do work in the national economy did not contain limitations contained in physicians' opinions that the ALJ gave significant weight. 864 F.3d at 952-53. Because the hypothetical did not contain all the claimant's limitations, the VE's testimony did not constitute substantial evidence that the claimant could perform certain work. *Id.* at 953.

Claimant's Counsel does not identify an opinion that was allegedly given substantial weight but whose limitations were not included in hypotheticals at the hearing. The ALJ gave great weight to the opinions of the state agency psychological consultants, including Dr. Rolland. (AR at 16.) However, Claimant argues that the ALJ should not have relied so heavily on these opinions because they were issued prior to Dr. Hansen submitting his opinion. Therefore, Counsel cannot be arguing that more of their opinions should have been included in the hypotheticals and RFC. The ALJ gave little weight to Dr. Hansen's opinion. Claimant's Counsel avers that this was actually no weight. (Doc. 14 at 10 n.7.) Thus, I assume that Counsel argues that the ALJ did not include any mental limitations in the RFC that are consistent with the weight she assigned to Dr. Hansen's opinion.

None of the hypotheticals the ALJ presented to the VE contained mental limitations. (AR at 44-46.) Claimant's final RFC does not contain any limitations related to mental impairments. (*Id.* at 13.) This is consistent with the weight the ALJ assigned

to Dr. Hansen's opinion and her finding that Claimant had only mild limitations in understanding, remembering, and applying information, and concentrating, persisting, or maintaining pace. (*Id.*) Contrary to Claimant's Counsel's assertion, assigning little weight to Dr. Hansen's opinion was not the same as assigning no weight to the opinion. Mild limitations do not indicate a need for any work-related restrictions and certainly do not indicate a finding of severe disability. As discussed, Claimant had consistently normal mental status examinations. She did not quit working because of mental health symptoms, but because of pain and because she kept falling asleep, which was attributed to side effects of medications. (*Id.* at 476, 680.) In fact, Claimant did not apply for benefits based on any mental health impairment. This lack of alleged disability based on mental impairments is "significant." *See Dunahoo*, 241 F.3d at 1039 (citing *Smith v. Shalala,* 987 F.2d 1371, 1375 (8th Cir. 1993)).

In conclusion, I find that the ALJ did not err by finding Claimant's mental impairments nonsevere at step two of the five-step process.

**D.    The ALJ was appointed in a constitutional manner.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 14 at 16.) Claimant asserts this Court should vacate the denial of benefits by ALJ Deans and remand the case for decision by what she contends is a properly-appointed ALJ. (*Id.* at 13.)

Claimant presented her Appointments Clause challenge to the Appeals Council. (*Id.* at 1, 171.) Therefore, forfeiture is not an issue in this case.

However, on July 16, 2018, while Claimant's case was in the administrative process, then-Acting Commissioner of Social Security Nancy Berryhill ratified the

47

appointments of all Social Security ALJs. (Doc. 14 at 17.) Claimant's Counsel argues that Ms. Berryhill had no power to appoint the ALJs because "the Federal Vacancies Reform Act as it relates to temporary Department Heads may only be constitutional as it relates to temporary appointments, since a principal officer requires Senate confirmation." (*Id.* at 18 n. at 10 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898).) Counsel argues that Ms. Berryhill was an inferior officer who did not have the power to appoint other inferior officers, in this case, ALJs. (*Id.* at 18-19 (citing *NLRB v. SW Gen., Inc.* 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring)).)

The Commissioner argues that there is nothing in any case Claimant's Counsel cites that "could be read to call into question the authority of an acting officer to exercise the powers of the vacant office." (Doc. 15 at 19.) The Commissioner further argues that there is "a long history of acting officials serving as Department Heads and exercising the powers of their offices." (*Id.* at 19-20 (citing Office of Legal Counsel, DOJ, *Designating an Acting Attorney General*, at 2 (Nov. 14, 2018) https://www.justice.gov/olc/file/1112251/download ("As all three branches of government have long recognized, the President may designate an acting official to *perform the duties of a vacant principal office*, including a Cabinet office, even when the acting official has not been confirmed by the Senate.") (emphasis added); *id.* at 8-28 (surveying this history).)

The Federal Vacancies Reform Act ("FVRA") provides the following:

(a) If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

   (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity . . . .;

   (2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which

48

> appointment is required to be made by the President, by and with the
> advice and consent of the Senate, to perform the functions and duties
> of the vacant office temporarily in an acting capacity. . .; or
> (3) notwithstanding paragraph (1), the President (and only the
> President) may direct an officer or employee of such Executive
> agency to perform the functions and duties of the vacant office
> temporarily in an acting capacity. . . .

5 U.S.C. § 3345.  Thus, a plain reading of the Act gave Acting Commissioner Berryhill the authority to appoint ALJs because that is one of the "functions and duties" of the office she was fulfilling in her capacity as Acting Commissioner of Social Security.

In addition, the cases cited by Claimant's Counsel are unhelpful to his argument. Counsel quotes *United States v. Eaton*, 169 U.S. 331, 334 (1898): "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official."  (Doc. 14 at 18 n.10.)  *Eaton* addressed the appointment of a Vice Consul to Siam who was appointed by the Consul to Siam to perform the duties of the Consul when the Consul became too ill to fulfill his duties and returned to the United States.  169 U.S. at 332-33.  *Eaton* did not address the duties that a temporarily-appointed inferior officer could perform.  Rather, the case only addressed the time that a Vice Counsel performed the duties of Consul, rather than the nature of the duties they were allowed to perform.

> Although section 2 of article 2 of the constitution requires consuls to be
> appointed by the president 'by and with the advice and consent of the
> senate,' the word 'consul' therein does not embrace a subordinate and
> temporary officer like that of vice consul, as defined in the statute. The
> appointment of such an officer is within the grant of power expressed in the
> same section, saying: 'But the congress may by law vest the appointment
> of such inferior officers, as they think proper, in the president alone, in the
> courts of law or in the heads of departments.' Because the subordinate
> officer is charged with the performance of the duty of the superior for a
> limited time, and under special and temporary conditions, he is not thereby

transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.

*Id.* at 343. Therefore, nothing in *Eaton* prevented Ms. Berryhill from performing all the duties of the Commissioner while acting in that capacity. *Eaton* states that during the time the Vice Consul served as Consul, he was "charged with the performance of the duty of the superior," just as Ms. Berryhill was so charged in this case. Furthermore, the *Eaton* Court reasoned that the rule allowing for the appointment of a Vice Counsel under the circumstances presented in the case served the public interest and prevented closure of the consular office. *Id.* at 342-43. Similar goals are served here. If Ms. Berryhill was not authorized to ratify the appointments of sitting ALJs after *Lucia*, and her replacement was not yet nominated by the President and approved by the Senate, "evil consequences" would result. *Id.* at 342. All the work of the SSA would effectively be open to Appointments Clause challenges. This is an absurd result.

Likewise, *Morrison v. Olson*, 487 U.S. 654 (1988) is not on point. *Morrison* addressed whether the independent counsel provisions of the Ethics in Government Act violated the Appointments Clause. 487 U.S. at 659-60. The Court held that special counsel were "'inferior officers' in the constitutional sense" due to the fact that the role is "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id.* at 671-72. The Court recognized that special counsel were given full power and independent authority "to exercise all investigative and prosecutorial functions and powers of the Department of Justice," but only within the scope of the jurisdiction granted

and not with the power to formulate policy.  *Id.*  In the case at bar, Claimant's Counsel proffers no evidence indicating that Ms. Berryhill's authority was so limited during her tenure as Acting Commissioner.  Rather, it appears that Ms. Berryhill was fulfilling all the duties of the Commissioner while in that role.[17]

Claimant also cites *NLRB* where Justice Thomas wrote separately "to explain [his] view that the Appointments Clause likely prohibited [NLRB's general Counsel's] appointment."  137 S. Ct. at 945.  However, the portion of the concurrence quoted by

_____

[17] Ms. Berryhill actually held the title of Acting Commissioner of Social Security twice.  She first assumed the role on January 21, 2017.  Mar. 6, 2018 letter from GAO Gen. Counsel Thomas H. Armstrong to Pres. Trump, https://www.gao.gov/assets/700/690502.pdf.  On March 6, 2018, the GAO determined that her term should have ended on November 17, 2017 in accordance with the FVRA.  *Id.*  Immediately following the GAO's notification in March 2018, Ms. Berryhill "stepped down from her role as Acting Commissioner and continued to lead the agency from her Deputy Commissioner of Operations position of record. . . . . [H]owever, on April 17, 2018, the President nominated Mr. Andrew Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of Mr. Saul's nomination."  *Patterson v. Berryhill*, No. 2:18-CV-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (citing 5 U.S.C. § 3346(a)(2) (providing that, once a first or second nomination for the office is submitted to the Senate, an acting officer may serve from the date of such nomination for the period the nomination is pending in the Senate)) (internal citations omitted).  As discussed above, it is my view that Ms. Berryhill had the power to fulfill all the duties of the Commissioner while holding that title.  To the extent Claimant's Counsel is pursuing some sort of "lapse or gap in authority" argument for the time Ms. Berryhill led the agency as Deputy Commissioner of Operations even though the act he takes issue with in this case was performed when she had the title of Acting Commissioner, I find that she had full authority to carry out all the Commissioner's duties at that time, too.  *See* Providing an Order of Succession Within the Social Security Administration, 81 FR 96337, 2016 WL 7487744 ("[T]he following officials of the Social Security Administration, in the order listed, shall act as and perform the functions and duties of the office of the Commissioner of Social Security (Commissioner), during any period in which both the Commissioner and Deputy Commissioner of Social Security have died, resigned, or become otherwise unable to perform the functions and duties of the office of Commissioner").

Claimant addresses an issue the majority did not address and is not binding. *Id.* at 946 ("The dissent's conclusion that the FVRA authorized the appointment in this case . . . implicates an important constitutional question that the Court's interpretation does not: Whether directing Lafe Solomon to serve as acting general counsel of the National Labor Relations Board . . .without the advice and consent of the Senate, complied with the Constitution. I write separately to explain my view that the Appointments Clause likely prohibited Solomon's appointment.").

None of the cases cited by Claimant addressed challenges to the appointments of inferior officers by temporarily-appointed officers.[18]   Therefore, Claimant's arguments do not convince me that this case requires remand based on Ms. Berryhill's status at the time she reappointed ALJ Deans.[19]   Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addresses the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020), and provides additional reasons why remand in a case such as this without Eighth Circuit mandate to do so, creates bad precedent.  No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950 (M.D. Fla. Jan. 28, 2020), the district court . . . . stated that "[t]he Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJs are so subject." *Id.* The district court points out that, "[a]t the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. . . . In contrast, there are currently over 1,700 Social Security Administration ALJs." *Id.* The district court also notes that "[t]he Social Security Administration annually receives about

---

[18] This lack of on-point precedent makes Claimant's Counsel's challenge to the Commissioner ring hollow: "If the agency has some historical precedent for an inferior officer constitutionally appointing other inferior officers, the Commissioner should have shared such precedent with the Court."  (Doc. 20 at 3.)

[19]  I am not sure what Claimant would have had Ms. Berryhill do other than re-appoint the SSA ALJs with *Lucia* as precedent and no permanent successor ready to take office.

2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings." *Id.* The district court concluded that "[i]f courts were to apply *Lucia* to Social Security cases as Plaintiff argues this [c]ourt should, millions of cases would need [to] be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

Finally, Claimant's Counsel argues that SSR 19-1p, which was issued on March 15, 2019 and which authorizes cases to be heard by new ALJs upon request if Appointments Clause challenges are raised during the administrative process, "constitutes an admission that SSA ALJs are inferior officers that had been improperly appointed before July of 2018." (Doc. 14 at 16.) Although SSR 19-1p recognized the potential impact of the *Lucia* decision, it contains no "admission" and I decline to impute one into the document. [20] Given the flood of litigation surrounding this issue, it is not surprising that SSA would promulgate a rule to ensure uniform handling of cases across the country. I will speculate no further on the motives surrounding the promulgation of SSR 19-1p.

---

[20] In part, SSR 19-1p provides the following:

> We interpret some challenges to the ALJ's authority to hear and decide a claim, based on the Supreme Court's decision in *Lucia*, as raising "a broad policy or procedural issue that may affect the general public interest" within the meaning of our regulations. Challenges to an ALJ's authority to decide a claim may raise a broadly applicable procedural issue independent of the merits of the individual claim for benefits—that is, whether the ALJ who presided over the claimant's hearing was properly appointed under the Appointments Clause of the Constitution.

SSR 19-1p (Mar. 15, 2019).

Based on the above discussion, I find that ALJ Deans was properly appointed.  I find that the case need not be remanded based on this issue.  However, because I recommend that the case should be remanded based on other issues, Claimant's Counsel should be permitted to assert this objection on remand.  *See Weatherman v. Berryhill*, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at *4 (W.D.N.C. Dec. 10, 2018); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018); *Clayton C. v. Comm'r of Soc. Sec.*, No. C18-638 BHS-BAT, 2018 WL 5985255, at *4 (W.D. Wash. Oct. 16, 2018), *R. & R. adopted sub nom, Christianson v. Berryhill*, 2018 WL 5962899 (Nov. 14, 2018).  Relying on *Mann*, this Court has noted, "[O]n remand, a claimant may challenge an ALJ's appointment because Appointments Clause challenges are deemed to be in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR, 2019 WL 1212127, at *5 (N.D. Iowa Feb. 19, 2019) (internal quotations omitted).  If, however, the District Court declines to remand the case, this argument should not provide an independent basis for remand.

## IV.    CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part** the decision of the ALJ.  On remand, the ALJ should reweigh the objective medical evidence related to Claimant's hand and foot pain, the evidence of her daily activities, and Claimant's mother's third-party function report.  The ALJ should also consider Claimant's Appointment's Clause challenge that was first raised to the Appeals Council.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b).  Objections must

specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** this 21st day of April, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa